101  561
103  150

JAMES A. RANDALL v. THE EVENING NEWS ASSOCIATION.

*Libel and slander—Interpretation of language used—Instructions to jury—Evidence—Conduct of counsel.*

1. Articles were published in a daily newspaper charging a citizen with having favored and carried to a successful issue a scheme for his own and others' aggrandizement at the expense of the public, whose interests and desires were in opposition to it, through the acts of the board of estimates of the city where the paper was published, the names of the members of which the articles declared were to be held in reprobation by every citizen who believed in honest administration of the public finances. And it is held that the implication from the articles is plain that the citizen named had induced corrupt or improper action for his private gain; that the tendency of such charges is to bring him into public hatred, disgrace, contempt, and obloquy; that they reflect on his character; and that they are actionable.

2. The words "rob" and "steal," as used in the articles, were qualified by the rest of the language used, and it clearly appeared that said words were not used in the ordinary sense. And it is held that the court, in an action of libel brought for the publication of the articles, should have explained to the jury that they were to be interpreted as a whole, and that the ordinary and natural meaning of said words, in the connection in which they were used, should be taken.

3. Where on the trial of a suit for libel founded on the publication of articles reflecting upon the support by the plaintiff, as

101 MICH.—36.

a member of the Legislature, of an act providing for a boulevard in the city where he resided, two of his colleagues testify, in behalf of the defendant, to his statement in a speech made in support of the bill that his main purpose in going to the Legislature was to secure the passage of the bill, and incidentally to take care of his constituents, it is not competent for the plaintiff, when sworn as a witness in his own behalf, to state the substance of the speech, and argue therefrom to the jury that he did not say what the witnesses have stated because at variance with, or not a part of, the speech as rehearsed.

4. It is not always easy to discover the line of demarcation which separates the involuntary transgressions of propriety which arise from the honest zeal of counsel in the trial of causes, and the deliberate perversions or misstatements of testimony, or unjustifiable attacks upon parties or witnesses.

5. The only practicable method of controlling and keeping counsel within due bounds, when disposed to transcend their privileges, is with the trial court, which has a large discretion in such matters; and when this power is not exercised, and there is reason to believe that injustice has resulted from the improper course taken by counsel, this Court will grant relief.

Error to Wayne. (Brevoort, J.) Argued June 22, 1894. Decided September 25, 1894.

Case for libel. Defendant brings error. Reversed. The facts are stated in the opinion.

*Dickinson, Thurber & Stevenson,* for appellant.

*John Atkinson (Alfred Russell* and *Mark M. Powers,* of counsel), for plaintiff.

HOOKER, J. The defendant, being publisher of a daily paper, appeals from a judgment rendered against it in an action of libel. The alleged libel consists of three articles published in said paper upon the 15th day of April, 1891, in relation to a boulevard at that time projected in the city of Detroit, copies of which articles were set up in the declaration, and read as follows:

## "LET 'ER GO GALLAGHER.

### "The Boulevarders Win the Battle for Private Gain.

### "Twenty Estimators Speak for the People of Detroit.

"And the First Boodle of $200,000 is Voted for the Improvement of the Boulevard de Speculation—The Spigot Turned Open, and the Cash will Flow from Now On.

"Twenty of the estimators tumbled head over heels yesterday afternoon in their anxiety to be in harmony with the boulevarders, and to be placed on record as in favor of taxing everybody for the enrichment of a few real-estate speculators.   The 20 are Bagley, Campau, Cornell, De Vogelaer, Farrand, Gorenflo, Hargreaves, Hickey, Koch, Lenaert, Merritt, Mulheron, McKay, Sauer, Stenius, Taepke, Tuchoeki, Viehoff, Wild, and Wright.  Eleven estimators went on record as opposed to issuing any boulevard bonds without first getting the consent of the voters.  The 11 are Bayer, Galster, Hickox, Markey, Munroe, Peters, Petz, Raeske, Reaume, Ruch, and Valentine.

"The boulevarders counted noses before the meeting, and were sure of a majority for the bonds.  The board went into committee of the whole, and the minority, led by President Valentine, who yielded the chair to Estimator Farrand so that he could get down on the floor and talk, tried hard to stave off a vote.  They interposed motions to adjourn, knowing they had nothing to lose and everything to gain by delay, but they were outvoted every time.  Then, too, the boulevarders had the best talkers with them.  Estimator Mulheron directed the majority, but Estimator Sam Hargreaves, who has recently flopped and blossomed into the most rabid kind of a boulevarder, Charles Wright, Taepke, and James B. McKay gave them right royal support.  James A. Randall and some other real-estate speculators, who own property that will be enhanced in value by improving the boulevard by general taxation, were smiling auditors to the one-sided scrap.  They knew hours before the final vote was taken that they had a cinch on the bonds.

"Estimator Mulheron, chairman of the committee that had been considering the question of issuing bonds, was the only one of the five who was against submitting the bonds to the people. The other four members—Bayer, Ruch, Pospeshil, and Peters—insisted that the bonds should be submitted, and made a formal report that the bonds not be issued without the consent of the people.  Mulheron presented a report of his own making, in which he advised that the bonds be issued without being submitted to a popular vote.  The athletic doctor was loaded for bear, and he made a band-wagon speech that even Randall himself could not discount.  He told the board that no question in the 20 years that he has lived in Detroit has made so much trouble in local politics

as the boulevard. Then he got sentimental, and pleaded for the members to show their manhood and vote for the bonds, and thus repudiate, as Artemus Ward would say, the 'fowl slanders' that have been cast on the boulevarders.

"Estimator Taepke, like Mulheron, was primed for talking, but, not being a band-wagon orator, he didn't enthuse the boulevarders to quite the extent that the doctor did. Taepke chewed the chestnuts that the boulevarders have been retailing for years about how the city promised to improve the boulevard if the right of way was dedicated, and it would be but justice to fulfill the promise. He also rung in the old saw about how Detroit would have been Chicago 'if it was up to Chicago.' Sam Hargreaves related how he had experienced an awakening not many moons ago, and found that he had been following the wrong path in all the years that he was against the bonds. He was on the righteous path now,—the boulevarders' path. Estimator Charles Wright delivered a carefully prepared speech, which, while it contained nothing that had not been told dozens of times before, sounded well, because the estimator is a pretty fair talker.

"Estimator Raeske, in defending the majority report, said the issuing of the bonds as proposed would be a piece of class legislation. If the city wants to improve streets, let it do so in the heart of the city, and not go to the outskirts. President Valentine tried to get the recognition of Estimator Farrand, who was holding down the president's chair, but the acting chairman recognized Mulheron, who wanted to talk. President Valentine wanted to know if the minority were to be choked off in arbitrary form, but the doctor went on talking boulevard. There were loud calls for a vote, and the minority report, being signed by the chairman, was considered first. The acting chairman declared Mulheron's report carried on a *vive voce* vote, but a division was demanded by the minority. The division showed 19 for Mulheron's report, and 10 against it.

"The boulevarders let out a pent-up whoop when the result was announced, and didn't let up until they had run dry. The board, as a committee of the whole, rose, and went into a regular session again, President Valentine resuming the chair. Estimator Petz, one of the valiant minority, promptly sprung a motion to adjourn. The boulevarders wanted to clinch their victory, and a dozen of them were on their feet at one time, demanding a final vote on the bonds. Taepke, the boulevard but not band-wagon orator, wanted to know if 'we,' meaning the boulevarders, were not to have a fair show. President Valentine assured him that no snap judgments would be taken, but that one of the recognized rules of parliamentary law is that a motion to adjourn has preference to any other, and is always in order. The boulevarders were still appre-

JAS. A. RANDALL.—"COME, BOYS, AND HAVE SOMETHING WITH ME."

hensive, and every one of them who had his speech-making clothes on tried to talk at one time. The chairman frowned on the boisterous proceedings, and reminded the board not to forget that they were gentlemen. Order was finally restored, and the motion to adjourn was voted down. The final vote on the bonds was then ordered, and 20 to 11 for the bonds was the result, and the boulevarders cheered.

"The board transacted considerable other business before the bonds were taken up. The board of public works general fund was passed at $33,376, a reduction of $15,000 from the sum passed by the council. For the general road fund there was allowed $326,000, and for public building fund $15,000. The cut from the western market fund was restored, and $20,000 was appropriated for both an eastern and western market. Henry M. Duffield, president of the water board, explained that the $75,000 annually appropriated for the waterworks is a necessity, and the sum was allowed. The school estimates were allowed at $367,643.70, a reduction of $13,413 from the figures passed by the aldermen. In committee of the whole the board agreed to allow $54,000 for the maintenance of Belle Isle, $100,000 for improving the park, $6,300 for the maintenance of small parks, $14,250 for the improvement of the same; total, $174,550; less amount raised by proceeds of bonds, $100,000; total amount to be raised by taxation, $74,550. The last meeting of the estimators will be held tonight, when, according to the charter, all business must be concluded."

### "THE POET ON THE STEAL.

" Ode to the Estimators and Their Masters, the Boulevarders.

"And now, good folk, fling up your ready money; this town's about to flow with milk and honey. We've got a boulevard, the show is open; roll up and tumble, fling the ready soap in. Although your streets are full of holes and muddy, we'll fill your boulevards with roses ruddy. The ship of state is safe, we're at the rudder. Who'll lack for milk when you supply the udder? Who'll lack for honey, when you give the powers to plant the boulevard with choicest flowers? Did ye not vote it? Are not you creators of all these noblemen, the estimators?

" Down in your pockets, open up your wallets, throw in your cash as you threw in your ballots. Of course you add a trifle to our riches, and this may put a patch upon your breeches. But what of that? Come up and smell the flowers that line the borders of this road of ours. Recline your humble shanks beneath the trees; your worn trousers will invite the breeze; there sit upon the seats and rest your souls, and watch the way a rich man's carriage rolls.

" Contrast the scene, that there your optics greet, with your

own nasty, ill-paved, narrow street.  And think, O friends, if you
had but the brains, or knew enough to come in when it rains, if
you were keen at grinding your own axes, if you knew how to
enrich a town by taxes, if you knew how to make mean things
look pretty, if you knew how to build a splendid city, instead of
living plain and working hard, you'd own some land upon a
boulevard.

"For know, poor fools, to build a first-class nation, the land
must labor under high taxation.   And as in nations men must
take their classes, ·just so in this, there's wise men and there's
asses.   The wise men hold the most plethoric wallets, which
others fill by virtue of their ballots.   Here in Detroit, and surely
more's the pity, wise men are moved to boom our glorious city.
But, quite as cunning as proverbial foxes, they raise no question
for the ballot boxes.  Sometimes, indeed, conventions they invade,
but as a rule they buy them ready-made.

"The pity lies in this, and tell your neighbor, that all our good
must lie in private labor; that government, with all its power of
taxes, is only good for grinding private axes, when swerved from
well-known simple public uses, and slightly bent to favor pet
abuses, as when 'tis bent to smooth a road or rough-field for Mr.
Lothrop or for Mr. Duffield.   Taxation cuts the queerest sort of
caper to help O'Brien to shave some heavy paper, or take the
bread from out the poor man's cupboard to make a lawn for Mr.
Bela Hubbard.  And those who pay must now be making merry,
they've been so charitable to Mr. Ferry.   And, having given the
game, pay for the candle for such a gentleman as Mr. Randall."

### "THE BOULEVARD STEAL.

"The board of estimates has finally concluded to fasten the
$200,000 iniquity of the boulevard improvement bond issue on the
city.  At its meeting yesterday the recommendation of the council
that so large an amount be raised by bonding the city for a starter
on the work of boulevard-making was passed by a vote of 20 to
11.   In spite of the presentation of all the convincing arguments
against such an expenditure, in spite of the clearly personal
character of the appropriation, in spite of the fact that the only
people who were clamoring for the improvement were men who
expected to see the money eventually reach their own pockets
after it had been transferred by methods of law from other and
less favored property-owners, the board of estimates, the last hope
of the people, proved untrue to its trust, and set a precedent that
is even more dangerous and more harmful than was the appro-
priation of the sum which will be realized from the issue of bonds.
The men who were responsible for this steal for the benefit of
half a dozen land-owners were the following named members of

the board of estimates; their names are put in good, fair type, that the people may know who were the parties to the crime:

"JOHN N. BAGLEY,
"LOUIS P. CAMPAU,
"JAMES CORNELL,
"CAMILLE DE VOGELAER,
"WM. R. FARRAND,
"THEODORE GORENFLO,
"SAMUEL HARGREAVES,
"PATRICK H. HICKEY,
"J. WILLIAM KOCH,
"LEO LENAERT,
"ADOLPHUS MERRITT,
"JOHN J. MULHERON,
"JAMES B. McKAY,
"WILLIAM SAUER,
"PETER STENIUS,
"ALBERT TAEPKE,
"JOSEPH TUCHOEKI,
"WILLIAM B. VIEHOFF,
"WILLIAM L. WILD,
"CHARLES WRIGHT.

"This is the list that the people may ponder over when they who have property on the ordinary streets of the city turn up at the receiver of taxes' office year by year, for 30 years to come or longer, and wonder why it is that their taxes are so high, and who it was that fastened on the city the incubus that it will be so hard to shake off. They are names to be held in reprobation by every citizen who believes in honest administration of the public finances. They are names to be set down as those of men whose self-interest or whose mental obliquity made the beginning of the steal possible. And when other extravagances come, as come they will when so distinguished a precedent may be quoted in their favor, when other injustices are proposed and passed, and citizens wonder why the precedent was ever set, the list quoted above is one to refer to as a complete and accurate list of the 20 apostles of extravagance, who may from this time forward be considered the accessories before the fact to every sin of financial mismanagement that may hereafter be committed in this city under the guise and color of public good, though, like the present deal, its sum and end be the enhancement of private interest at the expense of the whole public.

"There is a moral in the transaction, however, in spite of its singular deficiency in any other kind of morality. The moral is that which the News has been preaching all these months,—that the city should not be put into debt unless the people be given a

chance to vote on every issue of bonds that it is proposed to add to the debt of the municipality. The action of the board of estimates in authorizing an issue of $200,000 of bonds that could not get the assent of one-fourth of the voters of the city if it were proposed at the polls is the strongest argument which a Democratic Legislature should need for enacting a provision providing for the submission directly to the people of all schemes involving the pledge of the public faith and credit. If the action of the board of estimates last night have the effect of showing the Legislature the dangerous power that has been lodged in hands other than those of the people, it will not have been, even bad as it is, an unmitigated evil; for, though it costs the city $200,000 to have the lesson applied, it will save it many times $200,000 in the future, by cutting away the possibility of the repetition of such an outrage."

Counsel for the defendant complain of the construction placed upon these articles by plaintiff's counsel, alleging that in his opening, and during the progress of the trial, he asserted that they charged the plaintiff with a crime, viz., larceny from the public treasury, and again that they charged that he robbed the public treasury.

An analysis of these articles shows that they substantially informed the public that the board of estimates of the city had voted to issue bonds of the city to the amount of $200,000, with the proceeds of which was to be commenced the construction of a boulevard; that this boulevard would, when constructed, enhance the value of the property of adjoining land-holders, of whom plaintiff was one; that the project was pushed by such land-holders for the purpose of furthering their private interests at the expense of the public, and that they were winners of a battle when the proposition was carried, as they knew that it would be some hours beforehand; that they were present at the time the matter was acted upon, and made noisy demonstrations of approval. It was called a "steal," and the land-holders aforesaid, including plaintiff, were said to be recipients of the benefits. Accompanying one

of the articles was a picture of plaintiff manipulating a faucet in the end of a gigantic hogshead, from which a stream of dollars fell into the pails of various persons ready to receive them. The measure was denominated an outrage perpetrated under the forms of law, which a large majority of the voters would not have permitted, could it have depended upon a vote of the people.

There is not that in the articles, construed together, or in any of them, taken as a whole, that can be properly said to charge the crime of larceny, or any other crime. They do, however, unequivocally charge the plaintiff with having favored and carried to a successful issue a scheme for his own and others' aggrandizement at the expense of the public, whose interests and desires were in opposition to it, through the acts of the estimators, whose names "are to be held in reprobation ·by every citizen who believes in honest administration of the public finances." The implication is plain that the plaintiff has induced corrupt or improper action for his private gain. The tendency of such charges is to bring him into public hatred, disgrace, contempt, and obloquy. They reflect on his character. Under the decisions of this Court, we think that the articles are actionable, and that no error was committed in their admission as evidence in the case.

Many assignments of error are based upon the assertions of plaintiff's counsel that the articles charged plaintiff with a crime; but as, under this decision, that is not likely to occur again, and the case must be reversed upon other grounds, it is unnecessary to discuss them, further than to say that the court might properly have stopped them by an interpretation of the writings, as requested by defendant's counsel.

The charge of the court consisted principally of requests to charge by counsel for the respective parties. Upon the

subject of the character of the articles complained of, they were as follows:   As requested by the plaintiff, he instructed the jury:

"1. In the article counted upon, the picture represents the plaintiff in a ridiculous attitude, and, in connection with the printed matter, charges him with having tapped the public treasury for his own benefit and the benefit of others associated with him.

"2. The picture and printed matter, taken together, are libelous upon their face, and entitle the plaintiff to a verdict for damages, unless the justification pleaded has been made out."

"5. In arriving at their conclusion as to the meaning of the words and picture, the law requires the jury, in the absence of proof, to give the words used their ordinary meaning.

"6. There is no evidence in this case tending to show that the words were not used in their ordinary sense."

"10. Under the circumstances, if the jury believe that the defendant intended by the article sued upon to charge plaintiff with improperly obtaining money from the public treasury, to be used for his own benefit and for the benefit of those associated with him, and in doing so he was a party to a crime, then Mr. Randall is entitled to a verdict for such an amount as will compensate him for the injuries done.

"11. He is entitled to compensation for damages to his reputation, and for the injury to his feelings, which such a publication would naturally cause."

The effect of this was to leave the jury to infer that the language of the articles might be found to impute a crime to the plaintiff.   In fact, the direction to give the words their ordinary meaning, and the statement that there was no evidence in the case tending to show that they were not used in their ordinary sense, cannot be sustained.   These words, "steal" and "rob," as used in the articles, were qualified by the rest of the language used, which clearly showed that they were not used in the ordinary sense of those words, as interpreted by plaintiff's counsel.   If so interpreted, a very different defense might

be required from that which would defeat an action based upon a proper construction of the language. The court should have explained to the jury that the articles were to be interpreted as a whole, and that the ordinary and natural meaning of the words, in the connection in which they were used in the articles, should be taken.

In his charge the court said, further:

"Remember, also, that the defendant has pleaded justification, and, unless the acts complained of (in the libel here set forth) are true, then your verdict must be for the plaintiff."

What were the jurors to understand were the acts complained of in the libel? Was it only that the plaintiff had, under forms of law, prevailed upon the officers of the city to vote to issue bonds for an improvement that would benefit him at the expense of the public, or was it that he had actually and manually feloniously stolen, taken, and carried away the money of the public, or even accomplished by other means the crime of larceny? It is obvious that the latter view of the case may have been taken by the jury, to the injury of the defendant in the way of increased damages, if nothing more.

Upon the trial it was developed that the action of the estimators was under a law which was passed by the Legislature when Mr. Randall was a member of the House of Representatives. Two of his colleagues were called on behalf of the defendant, who testified to conversations with the plaintiff tending to show his personal pecuniary interest in the passage of the act, and his knowledge that the proposed boulevard would be defeated if the people were permitted to vote upon the proposition, and that it was his main purpose, in going to the Legislature, to secure the passage of the bill, and incidentally to take care of his constituents. This last was stated to have been said in a speech in support of the bill. On rebuttal,

plaintiff was asked to give the substance of what he said in his speech upon the merits of the bill. Against objection he was permitted to state at length what he said upon the merits of the bill, and was allowed to read a paper which he stated that he read in the course of that speech to the House of Representatives, which he had claimed to be a message to the common council of Detroit, from the mayor of that city. This speech, as detailed by the witness, appears to have gone over the merits of the case from his standpoint as legislator. As evidence it was no more than hearsay. The statements therein made had nowhere the sanction of an oath. But one statement alleged to have been made by him before the House had been sworn to, and that was susceptible of either denial or explanation. It was not, however, competent for the plaintiff to state at length his speech upon the merits of the bill, and his controversy with the defendant, or the facts in relation to the alleged obligations of the city to provide for the boulevard, or to make the concluding statement to the jury, "You will see that I did not use the language referred to by witnesses Wettlaufer and Murtagh, and nothing like it." A denial of the statements of the witnesses against him was competent, but it was not competent for the plaintiff to state the substance of a speech, and argue therefrom to the jury that he did not say what these witnesses had stated because at variance with, or not a part of, the speech as rehearsed.

It is further complained that counsel for the plaintiff indulged, with too great freedom, in attacks upon the practices and motives of the defendant in relation to the case under consideration and other matters, and made statements not warranted by the evidence. It is not always easy to discover the line of demarcation which separates the involuntary transgressions of propriety which arise from the honest zeal of counsel in the trial of causes,

and the deliberate perversions or misstatements of testimony, or unjustifiable attacks upon parties or witnesses. We cannot fail to appreciate that they are exceedingly annoying, whether attributable to improper motives or not. The ideal trial has no place for them, and everybody knows that juries are to a greater or less extent inflamed by them, and that the danger of unjust verdicts is correspondingly increased. On the other hand, the propriety of strictures depends greatly upon the standpoint from which the subject is viewed. That which may appear very unjust and cruel to the object of the attack may seem entirely proper, and warranted by the facts, to another. The only practicable method of controlling and keeping counsel within due bounds, when disposed to transcend their privileges, is with the trial court, which has a large discretion in such matters. Where this power is not exercised, and there is reason to believe that injustice has resulted from the improper course taken by counsel, this Court will grant relief, as it has in some instances done. In the present case there is perhaps some reason to believe that the jury may have been prejudiced by unwarranted attacks of counsel. To say the least, some of the arguments used and statements made appear not to have been supported by evidence; but we think it unnecessary to discuss them, as the judgment must be reversed for the other reasons stated.

The judgment will be reversed, and a new trial ordered.

McGRATH, C. J., LONG and GRANT, JJ., concurred. MONTGOMERY, J., did not sit.